UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

PATRICIA M. POLOSKY,

                                    Plaintiff,

v.
                                                            3:15-CV-00884
                                                            (GTS/TWD)

CAROLYN W. COLVIN
ACTING COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.
_____

APPEARANCES:                                    OF COUNSEL:

LACHMAN & GORTON                                PETER A. GORTON, ESQ.
*Counsel for Plaintiff*
1500 E. Main St.
P.O. Box 89
Endicott, New York 13761

HON. RICHARD S. HARTUNIAN                        SIXTINA FERNANDEZ, ESQ.
U.S. Attorney for the                            Special Assistant U.S. Attorney
Northern District of New York
*Counsel for Defendant*
Room 218
James T. Foley U.S. Courthouse
Albany, New York 12207

OFFICE OF GENERAL COUNSEL                        STEPHEN P. CONTE, ESQ.
Social Security Administration                   Chief Counsel, Region II
26 Federal Plaza, Room 3904
New York, New York 10278

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**REPORT AND RECOMMENDATION**</u>

This matter was referred to the undersigned for report and recommendation by the Honorable Glenn T. Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) (2013) and Northern District of New York Local Rule 72.3(d). This case has proceeded in accordance with General Order 18 of this Court which sets forth the procedures to be followed when appealing a denial of Social Security benefits. Both parties have filed briefs. Oral argument was not heard. For the reasons discussed below, the Court recommends that the Commissioner's decision be affirmed.

## I.  BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Patricia M. Polosky filed for Disability Insurance Benefits on August 14, 2012, claiming disability as of October 15, 2010. (Administrative Transcript at 12.[1]) Plaintiff was born on March 29, 1964 and alleges disability due to degenerative joint disease in both knees, tenosynovitis in her left wrist, back pain, and depression. (T. at 368.) Her initial application was denied on October 23, 2012, and she subsequently filed a written request for a hearing on November 14, 2012. (T. at 12.) A video hearing was held on October 29, 2013 before Administrative Law Judge ("ALJ") Patrick Flanagan. *Id*. The ALJ issued his decision on February 28, 2014, finding Plaintiff not disabled. (T. at 12-20.) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for

---

[1] The Administrative Transcript is found at Dkt. No. 10. Citations to the Administrative Transcript will be referenced as "T." and the Bates-stamped page numbers as set forth herein will be used rather than the numbers assigned by the Court's CM/ECF electronic filing system. Citations not made to the Administrative Transcript will use the Court's CM/ECF electronic filing system.

review on June 22, 2014.  (T. at 1.)  Plaintiff timely commenced this action in the United States

District Court for the Northern District of New York on July 21, 2015.  (Dkt. No. 1.)

## II.     APPLICABLE LAW

### A.     Standard for Benefits

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI

disability benefits must establish that he or she is "unable to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A) (2006).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which exists
> in the national economy, regardless of whether such work exists in
> the immediate area in which he lives, or whether a specific job
> vacancy exists for him, or whether he would be hired if he applied
> for work.

§ 1382c(a)(3)(B).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. § 405(a)), the Social

Security Administration ("SSA") promulgated regulations establishing a five-step sequential

evaluation process to determine disability.  20 C.F.R. § 416.920(a)(4) (2015).  Under that five-

step sequential evaluation process, the decision-maker determines:

> (1) whether the claimant is currently engaged in substantial gainful
> activity; (2) whether the claimant has a severe impairment or
> combination of impairments; (3) whether the impairment meets or
> equals the severity of the specified impairments in the Listing of
> Impairments; (4) based on a "residual functional capacity"

3

> assessment, whether the claimant can perform any of his or her
> past relevant work despite the impairment; and (5) whether there
> are significant numbers of jobs in the national economy that the
> claimant can perform given the claimant's residual functional
> capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014). "If at any step a finding of disability or

non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thomas*, 540

U.S. 20, 24 (2003).

The plaintiff-claimant bears the burden of proof regarding the first four steps. *Kohler v.*

*Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)).

If the plaintiff-claimant meets his or her burden of proof, the burden shifts to the defendant-

Commissioner at the fifth step to prove that the plaintiff-claimant is capable of working. *Id.*

(quoting *Perez,* 77 F.3d at 46).

**B.     Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the

correct legal standards were applied and whether substantial evidence supports the decision.

*Featherly v. Astrue*, 793 F. Supp. 2d 627, 630 (W.D.N.Y. 2011) (citations omitted); *Rosado v.*

*Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985

(2d Cir. 1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts

whether the proper legal standards were applied, even if the decision appears to be supported by

substantial evidence. *Johnson*, 817 F.2d at 986.

A court's factual review of the Commissioner's final decision is limited to the

determination of whether there is substantial evidence in the record to support the decision.

42 U.S.C. § 405(g) (2012); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Roat v. Barnhart*, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010); *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "more than a mere scintilla" of evidence scattered throughout the administrative record. *Featherly*, 793 F. Supp. 2d at 630; *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258 (citations omitted). If supported by substantial evidence, the ALJ's findings must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [ALJ's]." *Rosado,* 805 F. Supp. at 153. A reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## III.    THE ALJ'S DECISION

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of October 15, 2010, through the date Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2010. (T. at 14.) At step two, the ALJ found that Plaintiff had severe impairments consisting of degenerative joint disease in both knees and tenosynovitis in her left wrist. *Id.* The ALJ found Plaintiff's amblyopia in her left eye, back condition prior to her date last insured ("DLI"), and her depression to be non-severe. *Id.* He then found at step three that Plaintiff's impairments did not meet or medically equal the severity of listed impairments 1.02 (Major Dysfunction of a Joint) in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"). (T. at 15.)

Prior to proceeding to step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC") and found that she was capable of performing the full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a). (T. at 16.) The ALJ further concluded that Plaintiff retained the ability to "lift and/or carry ten pounds occasionally, sit for six hours in an eight-hour day, and stand and/or walk for two hours in an eight-hour day." *Id.*

In support of his determination that Plaintiff was capable of performing sedentary work activities, the ALJ relied on medical records prior to the DLI and indicated that records concerning Plaintiff's complaints and treatment after the DLI were of "limited evidentiary value" in assessing Plaintiff's disability status. (T. at 18.)

At step four of the five-step analysis, the ALJ found that Plaintiff had no past relevant

work experience and had never engaged in substantial gainful activity. (T. at 19.) However, considering Plaintiff's age, education, work experience, and RFC, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. *Id.* At step five, the ALJ found that based upon Plaintiff's RFC for the full range of sedentary work, Plaintiff's age, education, and work experience, a finding of "not disabled" was appropriate in consideration of Medical-Vocational Rule 201.28. *Id.*

## IV.    THE PARTIES' CONTENTIONS

Plaintiff claims that: (1) the ALJ erred at step two by not finding her spine and mental impairments severe, (2) the ALJ erred by not including manipulative limitations in Plaintiff's RFC in deference to her wrist condition, and (3) the ALJ erred at step five by not consulting a vocational expert. (*See generally* Dkt. No. 12.) Defendant contends that the ALJ's decision that Plaintiff was not disabled is supported by substantial evidence. (*See generally* Dkt. No. 13.)

## V.    DISCUSSION

On this appeal, Defendant argues that the ALJ did not err at any step while evaluating whether Plaintiff was disabled as his decision was supported by substantial evidence. *Id.* The Court agrees and finds that the ALJ's classification of Plaintiff's spine and mental impairments as not severe, Plaintiff's RFC determination, and the ALJ's decision not to consult a vocational expert were all based on substantial evidence.

### A.    Severity

At step two of the evaluation, the medical severity of a claimant's impairments is considered. 20 C.F.R. §§ 404.1520(a)(4)(ii). A "severe impairment" is defined as "any

impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id*. at §§ 404.1520(c), 404.1521. "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs." *Id*. at § 404.1521(b). These include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out, remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. *Id*.; *see also Ianni v. Barnhart*, Civ. No. 02-74A, 2005 WL 3220220, at *11 (W.D.N.Y. Nov. 18, 2005); *Camacho v. Apfel*, Civ. No. 97-6151, 1998 WL 813409, at *6 (E.D.N.Y. July 22, 1998). The claimant bears the burden of presenting evidence to establish severity. 20 C.F.R. § 404.1512(c) (2015). The claimant must demonstrate "that the impairment has caused functional limitations that precluded him from engaging in any substantial gainful activity for one year or more." *Perez v. Astrue*, 907 F. Supp. 2d 266, 272 (N.D.N.Y. 2012) (citing *Rivera v. Harris*, 623 F.2d 212, 215 (2d Cir. 1980)).

A finding of not severe should be made if the medical evidence establishes only a slight abnormality which would have no more than a minimal effect on an individual's ability to work. *Id*. at 271; Social Security Ruling ("SSR") 85-28, 1985 WL 56858, at * 2 (1985).

Plaintiff argues the ALJ erred at step two by not finding Plaintiff's depression and back pain severe. (Dkt. No. 12 at 6-14.) However, there is little medical evidence in the record to support Plaintiff's claim that either impairment significantly limited Plaintiff's ability to participate in basic work activities.

1.    Depression

Plaintiff first complained of depression on April 29, 2004, where during her appointment at Lourdes Hospital ("Lourdes"), located in Binghamton, New York, she claimed that while she was "getting definite depression" during the winter, "now that the weather has cleared up she has noticed the depression is lifting." (T. at 368.) Plaintiff deferred a prescription for antidepressants during three appointments where she complained of depression: on April 29, 2004, January 10, 2006, and March 15, 2007. (T. at 345, 347, 368.)

Plaintiff was not treated for depression again until January 21, 2010, when Plaintiff complained that "she was not sleeping well at night and has lost interest in her surroundings. She denied suicidal ideation." (T. at 221.) At this appointment, Plaintiff presented with her "mood and affect" as "somewhat flat", was assessed with depression, and was prescribed ten milligrams a day of the antidepressant Paxil. *Id.* Plaintiff remained on ten milligrams of Paxil once a day through her DLI.[2] (T. at 217.) Notably, Plaintiff has never been hospitalized for psychiatric treatment and has not been diagnosed with a psychiatric impairment by a psychologist or psychiatrist before the DLI.

In 2010, Plaintiff worked at a bakery and worked with the Animal Care Council to rescue and foster cats. (T. at 33 and 59.) Plaintiff typically cared for three to four cats in her home as part of her work with the Animal Care Council. (T. at 59.) At no point does Plaintiff claim that

---

[2] Medical records indicate that as of June 7, 2012, Plaintiff was taking ten milligrams of paroxetine one a day. Paroxetine is also known by its trade name, Paxil. *Medication Guide: PAXIL*, http://www.fda.gov/downloads/Drugs/DrugSafety/ucm088676.pdf (last visited July 21, 2016)

her depression interfered with her ability to perform her duties at the bakery or her ability to foster and care for the cats. (T. at 34 and 59.) She testified that she was on her feet all day at work walking up and down stairs and that it was her knee and back that caused her to be unable to fulfill her employer's expectations. (T. at 34.) Plaintiff also claims that she does not typically have problems dealing with other people. (T. at 58.) While she was fired from her bakery job, Plaintiff claims that she applied to work at a local grocery store and that she felt it was "probably" realistic that she could do the work required of her there. (T. at 60.)

Edward Kamin, PhD, a psychological consultant who reviewed Plaintiff's file in October 19, 2012, found that there was "insufficient evidence to substantiate the presence of a disorder." (T. at 66.) Plaintiff argues her medical records indicate her "depression symptoms are caused by stress" and that "associated symptoms include fatigue, poor concentration, and poor sleep." (Dkt. No. 12 at 7.)

However, the examination at Lourdes which revealed these symptoms occurred on November 2, 2012, almost a year after her DLI. (T. at 293.) In addition, at that appointment the symptoms are noted as being caused by "post traumatic stress with recent weather" and that Plaintiff was "flooded last year", both recent events that are not mentioned in any records from before her DLI. However, the records from that examination do note that Plaintiff had presented with "gradual onset of *mild* depression starting about 2 years ago." *Id*. (Emphasis added).

Plaintiff also draws the Court's attention to records from January 10, 2006, prior to the DLI indicating Plaintiff had experienced "night sweats, mood swings, depression and nightmares." (Dkt. No. 12 at 7.) However, the medical records from that date show that the

"patient was suffering from [premenstrual symptoms] and the symptoms were due to [premenstrual symptoms]" and not due to depression. (T. at 347.) As Plaintiff bears the burden of presenting evidence to establish the severity of the alleged impairments, and she has failed to present any evidence that depression could impose significant limits on her ability to function in the work environment, the ALJ's determination of depression as non-severe is supported by substantial evidence. *See generally* 20 C.F.R. § 404.1512(c).

2. Back Pain

Plaintiff first sought treatment for her back pain on February 23, 1011, where she obtained chiropractic treatment from Abraham Nichols, D.C. (T. at 37, 289.) Yet Plaintiff does not complain of back pain to either of her treating physicians until August 11, 2011, where during a follow up appointment for her knee with Tier Orthopedic Associates ("TOA") she mentions "chronic low back pain that has increased over the past several months." (T. at 264.) Upon examination, Plaintiff had "tenderness over the LS spine" but the physician also found that "motor strength is 5/5 in quad, hamstring, EHL, tib ant and peroneus muscles bilaterally. Sensation is intact bilaterally." *Id*. TOA performed an X-ray during the appointment which showed a "degenerative type of scoliosis" and recommended a follow-up Magnetic Reasonance Image ("MRI"). *Id*. The MRI was performed on August 17, 2011, at Lourdes, and revealed "multilevel degenerative changes" but "no evidence of spinal or high-grade foraminal stenosis." (T. at 265.) At a follow-up appointment for her back at TOA on August 25, 2011, Plaintiff "continues to have on and off again low back pain." (T. at 267.) Plaintiff was sent home with a brochure on exercises that she could perform herself. *Id*.

Plaintiff does not complain of back pain again until April 10, 2012, where at an appointment with TOA she claims to have "had difficulty with back pain for the last 13 to 15 years, no clear inciting event."  (T. at 270.)  This is the first time Plaintiff alludes to the back pain occurring prior to the DLI.  At the end of the examination, Plaintiff is set up to receive three trial facet injections on the right side of her back with the plan to re-evaluate Plaintiff after the injections.  *Id*.  Yet, Plaintiff is not seen again for concerns about her back pain until an appointment with TOA on January 23, 2013, where she complains of "low back pain she has been having for many years."  (T. at 408.)  Plaintiff admits "she was offered facet injections, but she 'chickened out', now she would like to reconsider that."  *Id*.  Plaintiff underwent the facet injections on March 6, 2013, performed by TOA.  (T. at 409.)  She obtained "greater than 50% relief" from the injections.  (T. at 410.)

Plaintiff argues that although there is not a single mention in any of her medical records to indicate she complained of back pain prior to her DLI, the mere degenerative nature of her back condition proves it must have existed during the two and a half the window from her alleged onset date to her DLI.  (Dkt. No. 12 at 10.)  While Plaintiff does eventually undergo X-rays at TOA which show a "degenerative type of scoliosis", there is nothing in the record prior to her DLI to show she was suffering from back pain, let alone that the back pain was interfering with her ability to work.  (T. at 264.)  Although Plaintiff claims she has had back pain since high school, she admits that the first time she ever sought treatment for back pain was in February of 2011, two months after her DLI.  (T. at 37.)

Plaintiff's argument that the mere nature of her back condition permits the Court to

extrapolate that its existence in 2011 also proves its existence from her alleged onset date to her DLI in 2010 is without merit. Accordingly, the Court finds that the ALJ's determination of Plaintiff's back pain as non-severe is supported by substantial evidence.

### B.   Residual Functional Capacity

After step three of the evaluation, a claimant's RFC is determined. A claimant's RFC is the most she can do despite her limitations. 20 C.F.R. § 404.1545(a)(1). RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. "A regular and continuing basis means eight hours a day, for five days a week, or an equivalent work schedule." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quotations omitted)).

It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion. 20 C.F.R. §§ 404.1546(c), 416.946(c). In determining RFC, the ALJ can consider a variety of factors including a treating physician's or examining physician's observations of limitations, the claimant's subjective allegations of pain, physical and mental abilities, as well as the limiting effects of all impairments even those not deemed severe. *Id.* § 404.1545(a). Age, education, past work experience, and transferability of skills are vocational factors to be considered. *Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). Physical abilities are determined by evaluation of exertional and nonexertional limitations. Exertional limitations include claimant's ability to walk, stand, lift, carry, push, pull, reach, and handle. 20 C.F.R. §§ 404.1569a(b), 416.969a(a).

The ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2010). Once the ALJ has resolved a claimant's complaints of pain, he can then evaluate exertional and non-exertional limitations. *Lewis v. Apfel*, 62 F. Supp. 2d 648, 658 (N.D.N.Y. 1999).

The RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004) (citation omitted). "In assessing RFC, the ALJ's findings must specify the functions a plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient." *Roat*, 717 F. Supp. 2d at 267 (citation omitted). "RFC is then used to determine the particular types of work a claimant may be able to perform." *Whittaker*, 307 F. Supp. 2d at 440.

Plaintiff contends that the ALJ's RFC determination was not supported by substantial evidence because the ALJ failed to: (1) include any mention of Plaintiff's left wrist limitation in terms of manipulative function and (2) consider Plaintiff's depression and back pain when forming the RFC. (Dkt. No. 12 at 14-21.)

       1.   <u>Wrist</u>

Plaintiff initially complains of pain in her left wrist on May 14, 2010, and is diagnosed with "probable tendonitis" by TOA. (T. at 253.) On June 2, 2010, at a follow up appointment with TOA for her knee, Plaintiff mentioned that "her left forearm continues to give her pain." (T. at 255.) She was instructed to ice and splint the wrist. *Id*. On June 17, 2010, she again

complains of pain in her wrist and describes it as "radiating up the forearm and down her thumb." (T. at 220.) She was assessed with tendinitis and treated with ibuprofen and a wrist splint. *Id*. On July 14, 2010, Plaintiff described her wrist pain as "localized to the thumb side of wrist" and indicated that the wrist splint and ibuprofen had not relieved her pain. (T. at 256.) Plaintiff was diagnosed with deQuervain's tenosynovitis[3] of the left wrist. *Id*. Plaintiff subsequently underwent a cortisone injection in July which helped "quite a bit." (T. at 257.)

On December 2, 2010, Plaintiff reported that her left wrist "continues to give her some on and off discomfort." (T. at 258.) Plaintiff declined surgery for her wrist at that time and instead decided to try splinting the wrist again. *Id*. After the DLI, on July 25, 2013, Plaintiff had surgery on her wrist to remove a cyst. (T. at 286.) David Ellison, M.D., who performed the surgery, submitted a questionnaire where he found that Plaintiff was restricted in her "left hand: fine motor activity" to "use up to 1/3 of each working day." (T. at 286.) However, this restriction was qualified by a handwritten note above it reading that "this patient is recovering from surgery" and another handwritten note next to it indicating "surgery date was 7/25/13 - I am hopeful she will recover good function in her left hand." *Id*.

Despite Plaintiff's assertions that her RFC should have included manipulation restrictions because of her left wrist, there were numerous indications in the record that Plaintiff can perform

---

[3] De Quervain syndrome is swelling and inflammation of the tendons or tendon sheaths that move the thumb outward. The main symptom is aching pain on the thumb side of the wrist and at the base of the thumb, which becomes worse with movement. The area at the base of the thumb near the wrist is also tender. Joseph J. Biundo, *Tendinitis and Tenosynovitis,* MERCK MANUAL, http://www.merckmanuals.com/home/bone,-joint,-and-muscle-disorders/muscle,-bursa,-and-tendon-disorders/tendinitis-and-tenosynovitis.

many activities that require fine motor control. Prior to the DLI, there is no mention of restrictions on fine motor activity or manipulation from a medical source pertaining to Plaintiff's left wrist. All other medical records pertaining to Plaintiff's wrist are from after the DLI. Plaintiff is left handed, but does not make a single mention of struggling to write and claimed that she could paint for about an hour before she needed a break. (T. at 31, 48.)

When initially asked about her inability to adequately perform her job at a bakery, Plaintiff did not mention her wrist impeding her working abilities and only mentioned her back and knee. (T. at 34.) In fact, Plaintiff claimed she baked and did "a lot of dishes." *Id.* Yet later in the hearing, Plaintiff testified that her ability to wash the dishes at home was limited and that she would "do a few dishes" before having to "stop and take a break." (T. at 46-47.) Plaintiff testified that she could lift fifteen pounds, and that while she avoided lifting objects heavier than fifteen pounds, she could do so for a very brief time if she had to. (T. at 45.) Plaintiff also testified that she had difficulty twisting and gripping objects but later testified she vacuums, sweeps, and mops. (T. at 46 and 54.) It was not until Plaintiff was specifically asked whether her wrist injury interfered with her bakery job that she responded that "it interfered with my work quite a bit." (T. at 40.)

In deference to Plaintiff's left wrist complaints, the ALJ restricted Plaintiff to "lifting and carrying ten pounds." (T. at 18.) In forming the RFC, the ALJ took into account Plaintiff's prior work history at the bakery and her comments that it was her knee, and not her wrist, which prevented her from performing her duties. (T. at 18.) He also considered her ability to carry ten pounds, a bucket of cat litter, and a gallon of milk as well as medical reports detailing her wrist

as only bothering her "on and off." *Id*.

Due to the absence of any medical records prior to the DLI indicating a need for manipulative restrictions and in light of the medical records and Plaintiff's testimony, the Court finds that the ALJ's RFC finding as it pertains to Plaintiff's wrist complaints is supported by substantial evidence.

### 2. Other Impairments

Plaintiff further argues that the ALJ erred in forming her RFC by failing to take her mental and spinal impairments into consideration. (Dkt. No. 12 at 13-21.) However, right below the ALJ's RFC determination he notes that Plaintiff "alleges that she is unable to work due to scoliosis of the back, arthritis in both knees, a cyst on the left wrist, amblyopia in the left eye, and depression." (T. at 16.) The ALJ does not mention Plaintiff's purported spinal impairment or depression further in explaining his RFC determination. As discussed above, the record does not produce an iota of evidence to show that, prior to her DLI, Plaintiff's depression or spinal impairment would have affected her RFC. There is no mention of functional limitations stemming from her back pain or depression predating her DLI, and in the case of the spinal impairment, there is not even a single mention of back pain prior to the DLI. Even considering the medical records after her DLI, there are no mentions by a physician of restrictions on sitting, standing, lifting, or any form of physical activity. The only mention of physical limitations are Plaintiff's own statements during her hearing that sitting or standing for longer than a half hour makes her "very uncomfortable." (T. at 43.)

The Court finds that the ALJ's exclusion of Plaintiff's depression and spinal impairments

when determining her RFC was appropriate due to the lack of medical records evidencing any sort of restrictions due to either the depression or scoliosis. Accordingly, the Court finds that Plaintiff's RFC is supported by substantial evidence.

## C. Vocational Expert

Continuing with the fifth step of the evaluation of disability, the Commissioner bears the responsibility of proving that plaintiff is capable of performing other jobs existing in significant numbers in the national economy in light of plaintiff's RFC, age, education, and past relevant work. 20 C.F.R. §§20 C.F.R. §§ 404.1560(c), 416.960(c); s*ee Edwards v. Astrue*, No. 5:07 CV 898, 2010 WL 3701776, at *12 (N.D.N.Y. Sept. 16, 2010). Work exists in the national economy when it exists in significant numbers either in the region where the claimant lives or in several other regions in the country. 20 C.F.R. §§ 404.1566(a), 416.966(a). A hearing officer can determine whether a claimant's nonexertional limitations significantly diminish his or her work capacity by determining whether the claimant can meet the basic mental demands of competitive, remunerative, and unskilled work as provided in Social Security Regulation 85-15. SSR 85-15, 1985 WL 56857, at *3 (S.S.A. Jan. 1, 1985). These demands include the ability, on a sustained basis, to "understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." *Id*. at *4. A substantial loss of ability to meet any of these demands would severely limit the potential occupational base. *Sipe v. Astrue*, 873 F. Supp. 2d 471, 480 (N.D.N.Y. 2012).

Generally, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the "grids"). *Rosa v. Callahan*, 168 F.3d 72, 78 (2d

Cir. 1999) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986)).  The grids take into account the claimant's residual functional capacity in conjunction with the claimant's age, education, and work experience. *Id*.  "Based on these considerations the grids indicate whether the claimant can engage in any substantial gainful work existing in the national economy." *Id*.

The grids are inapplicable in cases where the claimant exhibits a significant nonexertional impairment. *Rosa*, 168 F.3d at 82; 20 C.F.R. § 404.1569a(c)(2).  The ALJ cannot rely on the grids if a nonexertional impairment has any more than a "negligible" impact on the claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert. *Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013).  A nonexertional impairment is non-negligible "when it . . . so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010).  However, after it has been determined that a plaintiff can perform unskilled work, application of the grids is appropriate. *Id*. at 410; s*ee also Howe v. Colvin,* No. 12 Civ. 6955, 2013 WL 4534940, at *18 (S.D.N.Y. Aug. 27, 2013) (a claimant's limitation to simple, routine, and repetitive tasks in a low stress environment had little or no effect on the occupational base of unskilled sedentary work).  "The mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines." *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986).

Plaintiff's argument at step five is two-fold, first asserting that the ALJ's RFC finding was insufficient, and additionally arguing that Plaintiff's RFC would render the grids inapplicable.  (Dkt. No. 12 at 13-21.)  Specifically, Plaintiff argues her RFC should have

included non-exertional limitations on the manipulative functioning of her left wrist, which required the testimony of a vocational expert. (Dkt. No. 12 at 20.) Defendant argues that the ALJ's RFC finding is supported by substantial evidence and the ALJ appropriately relied on the grids to find Plaintiff not disabled. (Dkt. No. 13 at 14.) The Commissioner is correct and the Court finds no fault with the ALJ's step five determination, in which he relied on Medical-Vocational Rule 201.21. (T. at 20.)

For reasons previously discussed, the ALJ properly determined Plaintiff's RFC and concluded that Plaintiff was only limited by her left wrist in terms of restricting the weight she could carry to ten pounds. Therefore, since substantial evidence exists in the record for the ALJ to conclude that Plaintiff did not have any nonexertional limitations in her RFC, the ALJ was under no obligation to identify specific jobs in the national economy that matched Plaintiff's RFC and his reliance on the grids was appropriate. While the Commissioner has the burden to show that a claimant can still perform jobs that exist in the national economy, "[i]n the ordinary case, the Secretary satisfies his burden by resorting to the applicable medical vocational guidelines . . . ." *Bapp*, 802 F.2d at 604. Therefore, the ALJ did not err at step five of the sequential review.

In light of the above, the ALJ's decision was based upon correct legal standards and substantial evidence supports his determination that Plaintiff was not under a disability within the meaning of the Social Security Act. 20 C.F.R. §§ 404.1520(g).

**WHEREFORE,** it is hereby

**RECOMMENDED**, that the Commissioner's decision be affirmed and Defendant's motion for summary judgment on the pleadings be **GRANTED** and the complaint (Dkt. No. 1) be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: July 22, 2016
      Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge